BANK OF COMMERCE & TRUST CO. v. J. F. DYE, et al.

Western Section.   January 15, 1926.

No petition for Certiorari was filed.

1. **Interpleader.  Trust company held to have an interest in property such as to bar it bringing a bill of interpleader.**
Where a bank and trust company was engaged to pass on title of real estate and advised parties in transaction and an attorney in the employ of bank bought the property at a trustee's sale, held that he held it for the bank and it had an interest that barred it bringing a bill of interpleader.

2. **Banks and banking.  Trust companies.  Bank or trust company handling matters involving legal skill or advice occupies the same relation with its customer that an attorney occupies to a client.**
A trust company that undertakes to render a service that involves legal skill, and in the handling of legal questions, involving advice in the handling of matters entrusted to it, occupies the same confidential relation with its customers that an attorney occupies to a client.  This contemplates perfect frankness, and fair dealing.

3. **Banks and banking.  Trust companies.  Act of officers in charge of any department or trust company is act of the corporation.**
Where parties consulted the attorney of a trust company in regard to a sale of real estate and he took advantage of them and bought the property for his own profit, held to be an act of the corporation.  The doctrine of respondeat superior applies.

Appeal from Chancery Court, Shelby County; Hon. F. H. Heiskell, Chancellor.

Affirmed.

Randolph & Randolph and S. J. Sheppard, all of Memphis, for appellant.

D. B. Puryear, and Geo. D. Dent, of Memphis, for appellee.

SENTER, J.   The original bill was filed in this cause by Bank of Commerce and Trust Company, as trustee, against J. F. Dye, individually and as executor of the will of Mrs. J. F. Dye, deceased, Giles B. Bond and W. T. Smith, as a bill of interpleader.  It was alleged in the bill that on November 7, 1912, Mrs. E. F. Gruelle, then a widow, executed to complainant as trustee, a trust deed conveying Lot 174 of the Country Club Place in Shelby county, Tennessee, to secure certain notes therein described; that said trust deed provided for the sale of the property at the request of the owner of the notes secured upon default in the payment of the notes according to the provisions of the trust deed; that Mrs. E. F. Gruelle married the defendant J. F. Dye, and died testate; that her will was probated in the county of Arkansas where she was living at the time of her

death, and appointed her husband, J. F. Dye, the executor of her will; that after the death of Mrs. J. F. Dye, default was made in the payment of the notes secured by the trust deed, and that complainant was called upon by the owner of the notes secured to foreclose the trust deed for the payment of the secured debts; that complainant proceeded to advertise and sell the property under the provisions of the trust deed, and applied the proceeds of the sale to the payment of the expenses of the sale and to the payment of the secured debt; that there remained a balance of $800.63 in the hands of complainant as trustee.

The bill further alleges that after the foreclosure sale the defendants Bond and Smith notified complainant of a contract which they had with defendant J. F. Dye individually and as executor whereby they claimed the balance of the proceeds realized from the foreclosure sale and notified complainant not to pay such balance over to J. F. Dye; that the defendant J. F. Dye, individually and as executor, also notified complainant that, he as the executor of the will of Mrs. J. F. Dye, and as the residuary beneficiary thereof, claimed to be entitled to the balance of such proceeds and made demand upon complainant for the payment of such balance to him, and further notified complainant that if his claim thereto was not recognized and paid to him at once, he would sue complainant to recover said sum. The bill further alleges that complainant, has at all times been willing to pay such balance to the person lawfully entitled thereto, but because of the multiplicity of claimants to the fund, and with their conflicting interests and claims that complainant does not know to whom to make such payment. The prayer of the bill asks that defendants be required to interplead and to have their rights to the funds settled, and to the end that complainant be permitted to pay the same into the court, and upon such payment being made into court, and the defendants required to interplead their respective claims, that complainant be discharged from further liability.

The bill also prayed for writs of injunction restraining the defendants, or either of them, from bringing any suit against the complainant.

Defendant J. F. Dye, executor and individually, answered the bill and made the answer a cross-bill. In his answer and cross-bill alleged that he had authorized one H. M. Callicott to make a sale of this property which had belonged to his wife, and which under her will was his property, subject alone to the deed of trust referred to in the original bill; that pursuant to that authority Mr. Callicott, as his agent, contracted a sale of the property to Owen R. Hughes; that Hughes in turn transferred and assigned his contract to Giles B.

Bond and W. T. Smith; that the contract price agreed upon was $1850, of which $100 was paid by Hughes as earnest money, and was retained by the real estate agent making the sale; that defendant was to be paid the balance of $1750 upon the completion of the transaction, the execution of the deed and examination and guaranty of title to be made by the Bank of Commerce & Trust Company; that after the contract of sale was made the transferees of Hughes, Bond and Smith and defendant Dye, delivered all papers to the complainant, Bank of Commerce & Trust Company, with instructions and authority that complainant conduct the matter of closing a trade between the parties.

The answer and cross-bill further alleges that the complainant is engaged in rendering such service to its customers or clients in such transactions; that it is a part of complainants business to examine titles and to execute title bond, or guarantee titles, and to close transactions such as this. That complainant had in its employ an attorney in charge of the title and guarantee department of its business, and also employees and agents in charge of its trust department that looked after and attended to the business of complainant in these respective branches, and to conduct the details. That J. G. Kincannon, attorney in the employ of complainant, handled the transaction for the parties; that said J. G. Kincannon, as the attorney and representative of complainant in examining the title for the parties and conducting the transaction was the attorney and representative of complainant; that said Kincannon, while representing complainant, and knowing all the facts with reference to the contract for the sale of the property by Dye to Bond & Smith advised that the property be sold under the trust deed, rather than at a private sale, as the best way to handle the transaction, and being acquainted with all the facts, and that defendant Dye could buy the property at the public sale under the trust deed, and could bid any price or sum on said property, as all the proceeds would go to him under the will of his deceased wife, after paying the secured debt and expenses, and that Dye could then convey the property to Bond and Smith according to his contract. The answer and the cross-bill of defendant Dye further alleges and charges that after complainant, through his said agents, had so advised the parties, and while they were acting for the parties in the transaction, and in full possession of all the facts with reference to the contract of sale, said Kincannon became the purchaser of the property at the price of $1785, and the deed was made by complainant, as trustee, to Kincannon.

The answer and cross-bill then charges that Kincannon shortly thereafter sold this property for $2750. The answer and cross-bill denies that complainant is the mere stakeholder of the balance of

the proceeds of $800.63, and denies that it can maintain the original bill as a bill of interpleader requiring the parties claiming the balance to interplead; and charges that complainant was acting in such matters for defendants Dye, and also for Bond and Smith, and then charges that defendant Dye is entitled to the proceeds of the sale, less the encumbrance debt, and that Smith and Bond are entitled to have the property conveyed to them, and if the property had been sold, then to have complainant pay Smith and Bond the reasonable value of the property.

Smith and Bond also filed an answer to the original bill and made the answer a cross-bill. The answer and cross-bill of Smith and Dye contains practically the same statements and charges with reference to the transaction as the answer and cross-bill of the defendant Dye, and also denies the right of complainant to have the original bill maintained as a bill of interpleader.

The cross-bill of defendants Bond and Smith makes Dye a defendant together with original complainant, and in the prayer of their cross-bill they seek a recovery against complainant for the difference in $1750 and $2750, and in the alternative, in the event they are mistaken as to their right of relief against the Bank of Commerce & Trust Company, they pray for a decree against defendant J. F. Dye, executor and J. F. Dye, individually, for said amount, and to have the funds in the hands of the bank subjected to the decree.

The Bank of Commerce & Trust Company, as cross-defendant, answered the respective cross-bills and in which they deny the material allegations in the respective cross-bills seeking relief against the Bank of Commerce & Trust Company.

At the hearing of the cause the chancellor decreed against the prayer of the original bill that it be treated as a bill of interpleader, and dismissed the original bill insofar as it is sought to be declared a bill of interpleader, and sustained the respective cross-bills of defendant J. F. Dye and of Smith and Bond, and decreed that J. F. Dye, executor of the estate of Mrs. E. F. Greulle (Mrs. J. F. Dye) recover of the Bank of Commerce & Trust Company the sum of $765.63, this being the difference between the sale price $1750 and the indebtedness covered by the trust deed, plus interest, a total of $861.34; and decreed a judgment against the Bank of Commerce & Trust Company in favor of Giles B. Bond and W. T. Smith for the sum of $1,000, plus interest $125, a total of $1125. To this decree complainant, Bank of Commerce & Trust Company, excepted and have appealed to this court, and have assigned errors.

The errors assigned are numerous, but may all be treated and considered and disposed of together.

We find the facts, briefly summarized, to be as follows:

Mrs. Gruelle, as the owner of the lot in question, executed a trust deed to the Bank of Commerce & Trust Company, as trustee, to secure the balance owing by her on this lot to the Country Club Place, a corporation from whom Mrs. Gruelle had purchased the lot; that she afterwards married defendant J. F. Dye, that she died testate, and by the terms of her will probated in Lawrence county, Arkansas, where she and her husband were living at the time of her death; she devised this lot to her surviving husband, defendant, and cross-complainant J. F. Dye; that J. F. Dye was made the executor to her will; that the property was encumbered by the trust deed referred to in the sum of about $900; that payments on this indebtedness were several months in arrears; that Dye desired to sell the property and have proceeds of the sale first applied to the encumbrance debt; that he procured Mr. Callicott, a relative of his deceased wife, and a real estate man in Memphis to look after the sale of the property; that Callicott procured another real estate man in Memphis, a Mr. Hayes, to negotiate a sale of the property; that Mr. Hayes procured a purchaser, Prof. Hughest, and Callicott as the agent of Dye, entered into a contract of sale with Hughest by the terms of which Hughes was to pay $1850 for the property, and Hughes paid $100 of this amount to Hayes, the real estate agent, as earnest money; Hughes transferred and assigned his contract to cross-complainants Bond and Smith, Bond and Smith paying to Hughes $175 as consideration for the transfer and assignment of the contract; that assignment was consented to by Callicott, as the agent and representative of Dye. Prior to the assignment of the contract to Bond and Smith, it appears that Hughes sought to interest Kincannon, to have Kincannon buy the property with him jointly; Kincannon who was then employed as an attorney by complainant in the title and guaranty department of complainant's business, took the proposition under advisement, and proceeded to investigate the title to the property. His investigation from the records of the trust department, of complainant, disclosed that the title to the property was in Mrs. Gruelle, and that the property was encumbered by the trust deed referred to, and in which complainant was made the trustee.

After ascertaining these facts, Kincannon advised Hughes of the status of the title, and of the trust deed, and suggested to Hughes that they not buy the property under the contract, but that they wait and bid on the property at the foreclosure sale, suggesting that they could probably buy the property cheaper at the foreclosure sale than under the contract. Hughes, it appears, then proceeded to assign his contract to Bond and Smith as above set forth. It was not then disclosed to Bond and Smith the state of the title, or the

matter of the encumbrance on the property, but Bond and Smith went to the title department of complainant, before closing the transaction, to have the title to the property investigated and the usual title guarantee made by complainant; that the matter was taken up by Bond and Smith with complainant through Kincannon, the attorney for complainant in charge of the title department, and also with Mr. Adams, who was in charge of the title guaranty department of complainant's business, and the matter was discussed with Mr. Kincannon with reference to the title, and also with reference to the foreclosure sale.

It appears from the record that Mr. Bond, who called on Mr. Kincannon as the agent and attorney of complainant, with reference to having the title investigated and guaranteed by complainant, explained fully to Mr. Kincannon with reference to this property, and left his contract and papers with Mr. Kincannon and that complainant, through its Mr. Kincannon, had a file made of the matter and undertook the service of looking after the title and guaranteeing the title, (upon Bond and Smith becoming the purchasers) and in handling the transaction.

It also appears that Mr. Callicott called on Mr. Kincannon and also Mr. Adams, as the representative of Mr. Dye and discussed the matter of the best way of closing and handling the transaction; that he was informed by these agents of complainant that the Bank of Commerce & Trust Company, at the request of Mr. Banks, the Secretary and executive officer of the Country Club Place, had already advertised the property for sale under the trust deed. Mr. Callicott then requested that the advertisement be withdrawn, and a new advertisement be prepared and published postponing the date of sale until he, Callicott, could return from a business trip to the west. It appears that Mr. Kincannon and also Mr. Adams, advised Mr. Callicott that it was best to let the property be sold under the trust deed, because of the fact that the will would have to be probated in Shelby county, Tennessee, and mentioned other complications that could be avoided by letting the property be sold under the trust deed, and at which sale Dye could buy the property and have deed made to himself or to Bond and Smith.

It appears that Mr. Adams, of the guaranty department of complainant's business, upon being advised with reference to the matter, agreed that that would be a good plan for handling and closing the transaction. It also appears that on the date of sale Callicott returned from the business trip to the West and got into communication with Kincannon with reference to the sale; that Kincannon then advised, or at least suggested to Callicott that he (Callicott) could not afford to bid any amount on the property in

excess of the price at which Dye had contracted to sell the property to Bond and Smith. It also appears that Mr. Bond on the date of the sale, got into communication with Mr. Kincannon with reference to the sale and sought Mr. Kincannon's advise as to whether he should bid on the property or what steps he should take with re- ference to the same; that Kincannon advised him that he should not bid on the property because of his contract with Dye to purchase the property from Dye at the contract price. It seems that in this con- versation Kincannon informed Mr. Bond that he himself intended to bid on the property as much as $1500, and advised or suggested to Mr. Bond that he not attend the sale.

It also appears that Mr. Kincannon informed Mr. Callicott that he intended to bid on the property for himself and gave him this information shortly before the sale and on the day of the sale; that the property was sold by the Bank of Commerce & Trust Company by its agent and representative, Mr. Vincent, and that at the sale there was spirited bidding between Kincannon and Callicott, who was bidding for Mr. Dye; that Mr. Callicott, because of the advice, or at least the suggestion made to him by Mr. Kincannon shortly before the sale that he could not afford to bid more than the sale price for the property, and that if he did so he would probably render himself liable in some way, quit bidding when the bidding on the property reached the contract price, and that Kincannon became the pur- chaser at $1785. It also appears that Kincannon subsequently sold the property for $2750.

We think the facts above set forth appear to be the facts as shown by a preponderance of the evidence.

It is contended for complainant, Bank of Commerce & Trust Com- pany, that Kincannon, as the purchaser of this property, was acting for himself alone, and that there was no relation between any of the parties that would preclude Kincannon from buying this property at a public sale and competitive bidding under the trust deed. It is further contended for the complainant that in selling this property it was performing its office and duty to the owner of the debt secured by the trust deed, and that the foreclosure of the trust deed by com- plainant at the instance of the owner of the debt was but the per- formance of its duty and obligation as trustee under the trust deed.

It is further contended that the complainant did not participate in the purchase of the property, or in any profits made by Kincannon on the purchase and sale of the property. The contention is further made for complainant that it did not have any contract or agreement to render any service to any of the parties to the transaction, except that in the event Bond and Smith desired complainant would render the service of investigating the title, and for the usual fee, would guarantee the title.

It is contended for Dye and for Bond and Smith that in the whole transaction the complainant was advising and counselling the parties as to the best method of handling and closing the matter; that Callicott was induced not to bid in the property for Dye because of the representations made by Kincannon to Callicott, to the effect that he could not afford to bid more than the contract price; that Bond was advised by Kincannon that he could not, because of his contract with Dye, afford to bid on the property at all, and that he should not attend the sale.

It is also contended for the defendants, Dye and Bond and Smith, that complainant holds itself out to handle such transactions to the public, and to close up such matters, and to advise patrons or clients, and to draw the necessary papers; to investigate the title and to guarantee the title; and for which it charges a fee; that in rendering this service they are placed in the status or attitude toward their customers or patrons, as attorneys, and that the same rule governing transactions between attorney and client apply to complainant in handling these matters, and in this branch of its business.

"Title Insurance Companies sometimes combine with the business of title insurance the examination of titles and conveyancing, and as the two businesses, the duty and liability of the company is radically different. In all matters relating to searching titles and conveyancing the company holds itself out to the public and assumes to discharge the same duties as an individual conveyancer or attorney, and in such transactions its duties and responsibilities are the same. As insurers of titles, however, these companies enter into contracts of an entirely different nature, contracts wherein the doctrine of skill and care has no such application, for where a company issues its policies of insurance guaranteeing that the title is not unmarketable or defective, no question of negligence in searching can arise." 38 Cyc. 354-355.

It seems to be the settled rule that where a bank and trust company, authorized to examine titles for its patrons, and to charge a fee for the service, that its liability is the same as that of an individual attorney. Under the laws of this State, bank and trust companies, or trust companies, are authorized and empowered under their charters to act as trustees, guardians, administrators, and other fiduciary relations with the public; also to examine titles. In all such matters where a fiduciary relation is created by the nature of the transaction, the same obligation and responsibility to the customer is assumed by the trust company exercising this right and authority as an attorney for his client. Renkert v. Title Guaranty Trust Company, 102 Mo. App. 267.

While the reported cases holding that the trust company assumes the same responsibility toward its customers as an attorney assumes toward his client, in most if not all of the reported cases, we have examined, or to which we have been referred, questions of negligence, and liability for negligence in handling the matters are presented. But we think that if the same liability accrues to a trust company for its negligence as would accrue to an individual attorney, that the same rule with reference to good faith, frank and fair dealing with the customers would apply.

The conclusion we reach is that a trust company that undertakes to render a service that involves legal skill, and in the handling of legal questions, involving advice in the handling of matters entrusted to it, occupies the same confidential relation with its customers that an attorney occupies to a client. This contemplates perfect frankness, and fair dealing.

> "An attorney employed to sustain title to land cannot purchase for himself any outstanding or opposing title against the interest of his client either before or after the cause is ended, or during the continuance or after the termination of the relation of attorney and client . . . also, in accordance with the policy of the law to prevent attorneys from sacrificing the interests of their clients for their own gain by acquiring interests adverse to their client, an attorney will not be allowed to reap any advantage from the purchase of claims against his client. In such cases the attorney can obtain, at most, no more than the sum actually paid by him for such claim." 2 R. C. L., pp. 972-3.

It is again stated in 2 R. C. L., page 972, Section 48, as follows:

> "According to numerous authorities a purchase of property by an attorney at a judicial sale in which his client is interested is against public policy, and the client may elect to treat him as a trustee, providing such right of election be exercised within a reasonable time."

The above rule is sustained by many of the States. 71 A. S. R., 670 (Neb.) ; Leisenring v. Black, 5 Watts (Pa.), 303, 30 Am. Dec., 322; 1 A. S. R., 259.

We deem the rule too well settled to require the citation of authority, that an attorney will not be permitted to take any advantage of his client to the personal profit of the attorney.

We are of the opinion, that in the instant case, the complainant Bank of Commerce & Trust Company, when consulted by the parties interested in the sale of this property as to the better course of closing up the transaction, should have frankly advised the parties that if the contract made by Dye with Hughes, and subsequently

assigned by Hughes to Bond and Smith, was to be carried out, that
Dye should purchase the property at the sale, either himself or by
an agent, and to the end that he could comply with the contract with
Bond and Smith.   Certainly under the facts of this record Mr.
Kincannon as the attorney and representative of complainant, and
was fully informed with reference to the contractual obligation be-
tween Dye and Bond and Smith to convey and make a good title
to Bond and Smith of this property.   Mr. Kincannon certainly knew
that Dye could bid any amount necessary at the sale under the trust
deed, as he would only have to pay the amount of the secured
debt and expenses, which was approximately $900, as all the balance
would go to him as the owner of the property, and under the will
of his deceased wife.   Bond and Smith had conferred with Mr.
Kincannon as the Attorney and representative of complainant, and
employed by complainant and placed in charge of that branch of
his business.   Mr. Kincannon had for reasons, unexplained by him,
advised Mr. Callicott not to bid more than the amount stated in the
contract.   All these parties acted upon the good faith of complain-
ant's agent and attorney in its employ.   It is true that Mr. Kincan-
non did state to Mr. Bond, and also to Mr. Callicott shortly before
the sale and on the day of the same, that he intended to bid on the
property himself.   But the fact that Mr. Kincannon disclosed his
purpose to bid on the property shortly prior to the sale and on the
same day of the sale did not operate as an excuse for doing the thing
that public policy should preclude him from doing; viz: taking
advantage of the situation, and the facts that came to him, and in
his possession by reason of the fact that these parties had conferred
and counselled with him.

We are also of the opinion that Mr. Kincannon by stating to Mr.
Callicott that he could not safely bid more than the contract price
on the property, induced Mr. Callicott to quit bidding at that
point.    Mr Callicott was evidently led to believe that Mr.
Kincannon would not take any advantage of the situation, and that
the interest of Mr. Dye, as well as the interest of Bond and Smith
would be protected at the sale.    Mr. Kincannon, we think, was
acting within the scope of his employment by complainant in
advising and councelling with both Mr. Callicott and Mr. Bond with
reference to this transaction.   We are further of the opinion that
it could not affect this case even though the complainant did not
participate in the profits accruing to Mr. Kincannon.   The com-
plainant is a corporation, and can only act through its agents and
officers and attorneys in charge of the respective branches of its
business.   When customers or clients or patrons seeking the services
of complainant in any of its branches of business rely upon, or acts

upon, advice or information coming within the scope of employment of its agent, the doctrine of respondeat superior applies.

We are of the opinion that there was no error in the decree of the chancellor. It results that all assignments of error are overruled, and the decree of the chancellor is affirmed. The appellant and its sureties on the appeal bond will pay the cost of this appeal.

Owen and Thompson, JJ., concur.